511 A.2d 907

National Fuel Gas Distribution Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued February 5, 1986, before President Judge CRUMLISH, JR., and Judges ROGERS, CRAIG, DOYLE, BARRY, COLINS, and PALLADINO.

*John H. Isom*, with him, *W. Russel Hoerner* and *Michael W. Gang, Morgan, Lewis & Bockius, for petitioner.*

*Billie E. Ramsey*, Assistant Counsel, with her, *Daniel P. Delaney*, Deputy Chief Counsel, and *Charles F. Hoffman*, Chief Counsel, for respondent.

*Craig R. Burgraff*, with him, *Norman James Kennard, Phillip F. McClelland,* Assistant Consumer Advocate, and *David M. Barasch,* Consumer Advocate, for intervenor, Office of Consumer Advocate.

OPINION BY JUDGE ROGERS, June 26, 1986:

National Fuel Gas Distribution Company (Petitioner or Distribution), a provider of gas service in northwestern Pennsylvania has filed a petition for review of an order of the Pennsylvania Public Utility Commission entered March 22, 1985, ordering it to reduce its gas costs by $297,700 to adjust for allegedly improvident gas purchases made in 1983 and to reflect such reduction in a current gas rate filing proceedings. This petition represents the last remaining unresolved issue concerning the petitioner's rate filing of October 1983, proposing an increase in annual operating revenues of about $10.3 million, later reduced by a stipulated settlement approved by the Commission to $3.6 million.

Distribution is a wholly-owned subsidiary of National Fuel Gas Company, so also is National Fuel Gas Supply Corporation (Supply).

Distribution, as we have said, serves consumers. Supply owns and operates major transmission pipelines and sells gas in interstate commerce and Distribution is one of its customers. The rates at which Supply sells gas are regulated by the Federal Energy Regulatory Commission (FERC). Supply produces some gas and it purchases some from other interstate pipeline companies; including Columbia Gas Transmission Corporation (Columbia). In 1983, Supply sold about 98% of its volume to Distribution.

In the Commission proceedings, the Office of Consumer Advocate (OCA) contended that had Supply, Distribution's affiliated gas supplier, purchased a larger amount of cheaper, locally produced gas during the pe-

riod March-June 1983, instead of purchasing gas from Columbia, its, Supply's, cost of gas sold to Distribution would have been $297,700 less than the amount it paid to Columbia so that Distribution's current gas rates should be reduced by this amount.

Distribution[1] responded that Supply, an interstate pipeline, was bound by a Federal Energy Regulatory Commission certificated contractual agreement with Columbia, another interstate pipeline, to purchase gas from Columbia under terms of the FERC approved tariff referred to in the contract.

OCA contended that the contract to which Distribution contended Supply was bound was not for the sale of gas by Columbia and its purchase by Supply but for the exchange of gas belonging to each from one to the other's pipelines; or, even if the agreement was for sale and purchase, it did not impose an obligation upon Supply to purchase a minimum quantity.

Administrative Law Judge Robert H. Christianson who had presided over this substantial rate case and the settlement of its principal issues, recommended that OCA's suggested adjustment be rejected on the ground that an action for breach of contract and damages could have attended Supply's refusal to purchase under the contract and that this was sufficient constraint justifying Supply's failure to purchase locally produced supplies.

Upon considerations which are not entirely clear to us, the Commission concluded that during the period March 1 through June 13, 1983 Supply was not obliged

---

[1] Neither Supply nor National Fuel Gas Company, the parent of Supply and Distribution, is a party to these proceedings. As we have noted, Supply and Distribution are wholly-owned subsidiaries of National Fuel Gas Company. The Commission, not unreasonably, sometimes refers to the several corporations indiscriminately as NFG. Columbia is not affiliated with any of the National Fuel Gas companies.

to purchase from Columbia as much of its supplies of gas furnished to Distribution as it did, that Supply could and should have purchased cheaper locally produced gas and that Distribution must reduce its current gas rate filings by $297,700, the amount OCA had suggested might have been saved by Supply's disregard of its contract with Columbia.

The contract[2] which is at the center of this litigation reads, except for the subscriptions, as follows:

*SERVICE AGREEMENT*

AGREEMENT made and entered into as of the 3rd day of August, 1981 by and between COLUMBIA GAS TRANSMISSION CORPORATION, a Delaware corporation, (hereinafter called Seller) and NATIONAL FUEL GAS SUPPLY CORPORATION, a Pennsylvania corporation, (hereinafter called Buyer).

*WITNESSETH:* That in consideration of the mutual convenants herein contained, the parties hereto agree as follows:

*Section 1. Gas to be Sold.* Seller hereby agrees to sell and deliver, and Buyer hereby agrees to purchase and receive natural gas on a firm basis, up to a Contract Demand of:

32,100 Dth Per Day in Seller's Rate Zone 6.

*Section 2. Rate Schedule.* Gas delivered hereunder shall be paid for under the effective Rate Schedule CDS of Seller's FERC Gas Tariff

---

[2] As can be seen, the parties have titled the agreement a Service Agreement. The agreement was executed by the parties. FERC has defined the word "contract" as including an executed service agreement. 18 C.F.R. 151.12. It has defined the term "service agreement" as an unexecuted service agreement under the company's tariff. 18 C.F.R. §154.13. Because the service agreement in this case is executed, we have called it a contract throughout this opinion.

on file with the Federal Energy Regulatory Commission and as the same may hereafter be amended or superseded in accordance with applicable rules and regulations of the Federal Energy Regulatory Commission.

*Section 3. General Terms and Conditions.* This Agreement in all respects shall be subject to the applicable provisions of Rate Schedule CDS of Seller's FERC Gas Tariff and of the pertinent General Terms and Conditions incorporated therein filed with the Federal Energy Regulatory Commission, which are by reference made a part hereof.

*Section 4. Term.* This Agreement shall be effective as of November 1, 1981, unless Seller advises Buyer that the necessary facilities will not then be completed, in which case the effective date shall be the date Seller advises Buyer that it is able to render the additional service and shall continue in effect until November 1, 1991 and thereafter from year to year unless and until terminated by written notice given by either party. Such notice may terminate this Agreement on November 1, 1991 or on any November 1st thereafter and shall be given to the other party not less than six (6) months prior to the desired termination date.

*Section 5. Delivery Point or Points.* The delivery point or points shall be: at the outlet side of Seller's measuring stations located in (i) Seller's Ellwood City Compressor Station in Beaver County, Pennsylvania, and (ii) near the southern terminus of Seller's Line No. 10202 in Warren County, Pennsylvania, and at such latter point Seller shall tender local purchase and production quantities, and Buyer shall be obligated to take

delivery of such quantities up to 10,200 Dth per day, and (iii) near Seller's Waterford Compressor Station in LeBoeuf Township, Erie County, Pennsylvania, and at such latter point Seller shall tender local purchase and production quantities and Buyer shall be obligated to take delivery of such quantities up to 10,300 Dth per day during the winter months (Nov. 1 - March 31) and up to 5,100 Dth per day during the summer months (April 1 - Oct. 31) and (iv) at such other delivery point or points as hereafter may be authorized by the FERC. In addition, Buyer shall not be obligated to take delivery at the points of delivery listed in (ii) and (iii) at a total quantity in excess of 12,300 Dth per day during the summer months.

*Section 6. Delivery Pressure.* The maximum pressure at which Seller may be required to deliver gas hereunder shall be:

Ellwood City—700 pounds per square inch gauge.

Warren County—400 pounds per square inch gauge.

Erie County—500 pounds per square inch gauge.

*Section 7. Notices.* Notices to Seller under this Agreement shall be addressed to it at Post Office Box 1273, Charleston, West Virginia 25325, and notices to Buyer shall be addressed to it at 10 Lafayette Square, Buffalo, New York 14203, until changed by either party by written notice.

*Section 8. Cancellation of Previous Contracts.* This Agreement supersedes and cancels, as of the effective date hereof, the following contracts between the parties hereto for the sale of gas by Seller to Buyer, as listed below:

Service Agreement dated June 9, 1980 providing for Natural Gas Service under Rate Schedule CDS.

The Commission may have concluded that the agreement was for the exchange, not the sale, of natural gas; or it may have concluded that even if it were a sales agreement, Supply was not obliged to purchase Columbia's gas if it could purchase cheaper gas from local sources. The Commission wrote:

> The language of the Service Agreement does not clearly indicate any . . . obligation to purchase any minimum quantities of gas at the indicated delivery points. In this regard, the Service Agreement requires the Seller [Columbia] to tender and the Buyer [Supply] to take delivery of gas quantities up to certain specified Dth per day.
>
> . . . .
>
> We do not place any particular significance on the use of the terms 'Buyer' and 'Seller' in the Service Agreement since we observe that both parties, Supply and [Columbia] undoubtedly entered into a significant number of purchase agreements and it could be customary for the parties to consider themselves as 'Buyer' and 'Seller' even under an exchange agreement.
>
> The record establishes the fact that the additional delivery points at Sugar Grove and Waterford stated in the Service Agreement were necessitated by [Columbia's] development of local production in the area some distance removed from its pipelines but adjacent to Supply's pipeline facilities. This would be a logical situation for the parties to enter into an exchange, rather than a purchase arrangement. . . .

. . . Although NFG contends that it did not purchase this less costly local production because of obligation requiring Supply to continue gas purchases from Columbia, in accordance with the above discussion, we conclude that there were no constraints on Supply during the period in question, which would have precluded reducing gas purchases from Columbia. . . .

In accordance with the preceding discussion, we conclude that NFG could have reduced its gas cost rate by the purchase of 1,002,000 mcf of locally produced gas, at a reduced cost of $297,700 for the March-June 1983 period.

The Commission's discussion appears to us to be a conclusion in search of justification rather than a reasoned search for the intention of the parties to this written contract. The Commission places no "particular significance" to the parties' use of the words "Buyer" and "Seller" because the parties "undoubtedly" had entered into other sales agreements; so that it "could be customary" for them to "consider themselves" buyers and sellers even under an exchange of gas agreement. The Commission surmises that because Columbia had developed local production near Supply's pipeline at two of the delivery points mentioned in the contract this "would be a logical situation" for the parties to enter into an exchange rather than a sales agreement.

The Commission also concludes, with scant elaboration, "that there were no constraints on Supply" which would have prevented it from purchasing less gas from Columbia than the amount agreed upon. We will comment on this conclusion after we consider the agreement generally.

The Commission's task was, and ours is, that of interpreting a written contract. The principles applicable are:

When interpreting a contract the intention of the parties must be determined, and in ascertaining that intention effect must be given to all the provisions of the contract. Sykes v. Nationwide Mutual Ins. Co., 413 Pa. 640, 198 A.2d 844 (1964); Breen v. Rhode Island Ins. Co., 352 Pa. 217, 42 A.2d 556 (1945). In a written contract the intent of the parties is the writing itself and when the words are clear and unambiguous the intent is to be determined only from the express language of the agreement. East Crossroads Center, Inc. v. Mellon-Stuart Co., 416 Pa. 229, 205 A.2d 865 (1965); Siciliano v. Misler, 399 Pa. 406, 160 A.2d 422 (1960); Kennedy v. Erkman, 389 Pa. 651, 133 A.2d 550 (1957); Atlantic Refining Co. v. Wyoming Nat'l Bank of Wilkes-Barre, 356 Pa. 226, 51 A.2d 719 (1947); Commonwealth v. Nelson-Pedley Const. Co., 303 Pa. 174, 154 A. 383 (1931). 'When a written contract is clear and unequivocal its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence.' East Crossroads Center, Inc. v. Mellon-Stuart Co., supra at 230-31, 205 A.2d at 866. Furthermore, this Court long ago emphasized that '[t]he parties have the right to make their own contract and it is not the function of this Court to rewrite it, or give it a construction in conflict with the accepted and plain meaning of the language used.' Hagarty v. William Akers, Jr. Co., 342 Pa. 236, 20 A.2d 317 (1941).

*R. F. Felte, Inc. v. White*, 451 Pa. 137, 143-144, 302 A.2d 347, 351 (1973).

While the Commission received evidence concerning the delivery points at which, because Columbia had local supplies, gas could have been exchanged as well as sold, there is nothing of a special or technical nature involved in this transaction which requires, or indeed suggests, that any of the contract language had esoteric meaning or that the Commission for any other reason, was better equipped than others, in this case this court, to interpret it.

We have concluded that the words of the contract are clear and unambiguous and that the contract clearly and unequivocally provides for the sale of gas by Columbia to Supply. Section 1 provides that the seller, Columbia, agrees to sell and Supply, buyer, agrees to buy. Section 2 provides that the gas "shall be paid for" under a Rate Schedule of Columbia's Federal Energy Regulatory Commission Gas Tariff. This tariff, or portions thereof, is in the record; it fixes the amounts Columbia may charge for its gas.

Section 5 describes the places at which Columbia shall deliver and Supply shall accept delivery of gas. The Commission wrote that this section could as well describe points of exchange of gas as points of delivery for sale, disregarding the fact that the same section names the provider, Columbia, the Seller and the receiver, Supply, the Buyer. The Commission also observed that at a time after the contract at suit was executed, Supply and Columbia entered into an agreement for the exchange of gas at one or more of these delivery points. This argument cuts both ways. It seems to us that rather than indicating that the parties intended this contract to be one for the exchange of gas, it demonstrates that when the parties intended to exchange gas they could write contracts which appropriately expressed that intention, with the effect that the agreement *sub judice,* calling for the purchase and sale of gas was just that.

We again observe that Supply and Columbia are not affiliated enterprises. No reason is suggested for why, if they had agreed on the exchange of gas, they would have entered into a contract for the sale and purchase of gas. The subject of this appeal is the reasonableness of the cost to Distribution of gas it purchased from Supply which Supply had in turn purchased from Columbia. There is no question that Supply purchased gas from Columbia under the agreement here in suit or that Distribution bought this gas from Supply. No reason is offered for why Supply would pay Columbia for gas received under an exchange agreement or for why, if Supply had not paid for the gas, it would charge Distribution. If either had happened, we would be in the presence of scandal. Nothing of the sort is suggested. These considerations also support our conclusion that the agreement was for sale and purchase, just as the parties describe it.

Either as an alternative to its apparent conclusion that the service agreement was for the exchange not sale of gas or as an independent reason for the disallowance of this $297,700 paid to Columbia for gas, the Commission, as we have seen, concluded that Supply was not required to purchase any minimum quantity of gas from Columbia. Distribution replies that Section 5 of the agreement clearly required Supply to purchase gas delivered by Columbia at two places, Sugar Grove in Warren County and Waterford in Erie County. We agree with Supply and disagree with the Commission. Section 5 reads pertinently:

> The delivery . . . points shall be the . . . outlet side of Seller's [Columbia's] measuring stations located in (i) . . . (ii) [Sugar Grove], and at such . . . point Seller shall tender local purchase and production quantities, and Buyer [Supply] *shall be obligated* to take delivery of such quantities

up to 10,2000 D$^{th3}$ per day, and (iii) [Waterford] and at such . . . point Seller shall tender local purchase and production quantities and Buyer *shall be obligated* to take delivery of such quantities up to 10,3000 D$^{th}$ per day during the winter months . . . and up to 5,100 D$^{th}$ per day during the summer months. . . . In addition Buyer *shall not be obligated* to take delivery at . . . [Sugar Grove and Waterford] at a total quantity in excess of 12,300 D$^{th}$ per day during the summer months. (Emphasis supplied.)

As we have said before this language plainly obligated Supply to take delivery at the points mentioned of such quantities of gas as Columbia should tender up to the maximum mentioned.

The Commission concluded that the contract "does not clearly indicate any . . . obligation to purchase any minimum quantities at the indicated delivery points." The Commission writes that the contract "requires the Seller to tender and the Buyer to take delivery of gas *up to* certain specified D$^{th}$ per day." The emphasis is the Commission's. On the contrary, the contract says that "the Seller shall tender . . . quantities [of gas] and that the Buyer shall take delivery of such quantities up to the specified maximum." The phrase "up to" imposes a maximum limitation on what the Buyer is obligated to take; it does not absolve the Buyer from the obligation to purchase any gas tendered in less than that maximum.

The Commission then, departing from the language of the contract, notes that the pertinent FERC tariff contains no minimum commodity bill provision and remarks that the Federal Power Commission (later

---

[3] A Dekatherm (D$^{th}$) is a heat measurement equal to about 1,000 cubic feet of gas.

FERC) "has twice rejected [Columbia's] attempt to include a minimum commodity bill provision in [Columbia's] tariff." It is not clear to us what the Commission, in the context of this case, believed those facts imported—whether the Commission concluded that those facts compelled the further conclusion that the parties did not intend that Supply should be obligated to take delivery of any of the gas tendered by Columbia or whether it believed that the contract was somehow violative of federal law, relieving Supply of the obligation to comply. We need not dwell on this choice of possibilities because both asserted "facts" are chimerical.

A minimum commodity bill provision is one which requires a buyer to purchase, that is, pay for, a minimum amount of gas. Another term, minimum take provision, is given to a requirement that a buyer physically take possession of minimum quantities of gas, that is, take the gas as well as pay for it. Setting aside as a peccadillo that the Commission refers to the absence in the tariff of a minimum commodity bill and Section 5 of the contract is a minimum take provision, we direct our attention first to the Commission's notion that the Federal Power Commission had twice disallowed the inclusion of minimum commodity bill in Columbia's rate schedules. In fact, in the first asserted instance, memorialized in *Lynchburg Gas Company v. Federal Power Commission,* 336 F.2d 942 (D.C. Cir. 1964), the Federal Power Commission had approved the inclusion of a minimum commodity bill in Columbia's rates; but the circuit court set aside the Federal Power Commission's order as not supported by the findings and remanded for findings. The second asserted instance was the action of the Federal Power Commission on remand in refusing to approve Columbia's minimum commodity bill, with express recognition that Columbia might with more ex-

perience with its existing rates be able later to justify minimum commodity rates. The circuit court affirmed the Federal Power Commission's order. *Atlantic Seaboard Corporation v. Federal Power Commission,* 404 F.2d 1268 (D.C. Cir. 1968). Hence, upon analysis, there appears to have been one instance twenty years ago of a refusal by the Federal Power Commission to permit Columbia to include a minimum commodity bill in a tariff affecting a portion of the State of Virginia, a circumstance not shown on this record to have anything to do with the absence of a minimum commodity bill in this case concerning service in northwestern Pennsylvania.

Moreover, the asserted absence of a generally applicable minimum commodity bill in the pertinent Columbia tariff would appear to be of no effect for the reason that the contract containing, as we believe, a minimum take requirement was certainly on file with FERC and according to the OCA's expert has been approved by the FERC. Counsel for OCA elicited from his witness the following:

Q   Mr. Donkin, we have marked for identification OCA Exhibit 11 in this proceeding this morning which is a service agreement between Columbia Gas Transmission and National Fuel Gas Supply. Have you seen that document?

A   I have.

Q   And did your office obtain this exhibit from the files of FERC?

A   Yes, it did.

Q   And when did you find that document?

A   It was on April 16th, 1984.

Q   Was this the most up-to-date service agreement that FERC had in its files?

A   Yes.

Q   Is this the same service agreement that was presented to OCA by National Fuel Gas Distribution Corporation upon discovery?

A  Yes, it is.

Q  And please tell us what is a service agreement?

A  I suppose it can be defined in many ways, but in American Gas Association's Gas Rate Fundamentals, it's described as a document which attests to the fact that the utility and a specific customer have entered into an agreement for the supply of gas to a building or location for a particular use.

Q  And is the service agreement approved by the FERC?

A  It is.

This testimony is consonant with law and regulation. The Natural Gas Act at 15 U.S.C. §717c(c) provides that every natural gas company shall file with FERC schedules of its rates and charges and the classifications, practices and regulations affecting such rates and charges *together with all contracts* which in any manner affect or relate to such charges. FERC regulations at 18 C.F.R. §154.1 also require the filing of contracts. As we have noted in the margin at footnote 2, by FERC regulation the agreement in this case, having been executed, is a contract. If as OCA's witness testified, this contract was filed with and had been approved by FERC, the Pennsylvania Public Utility's emphasis upon the circumstance that it was not included in Columbia's tariff as support for its conclusion that Section 5 related to the exchange of gas, was misplaced. In any case, as Distribution cogently argues the question of whether the charges made by Columbia to Supply, both interstate gas pipeline companies, are regular is one exclusively for FERC to decide. There is no evidence of a question as to the regularity of the contract by FERC and, as we have pointed out, indication of regularity in the contract's presence in FERC's files and, according to OCA's witness, its having been approved.

OCA adduced other evidence which it contends, but Distribution disputes, supports the Commission's conclusion that Section 5 may have been an agreement for the exchange of gas, the description of which would overburden this opinion especially in view of the fact that the Commission does not mention these matters in its decision.

Nor will we provide a dilatation upon Distribution's arguments, with which also we disagree, that the Commission's adjustment of Distribution's claim for purchased gas at prices determined by a contract between two FERC regulated utilities was a violation of constitutional law based upon principles of federal preemption and supremacy, because we think the case of *Pike County Light and Power Company v. Pennsylvania Public Utility Commission,* 77 Pa. Commonwealth Ct. 268, 465 A.2d 735 (1983), is directly in point and controlling of this issue.

Having concluded that the contract between Supply and Columbia was for the purchase by the former and sale by the latter of natural gas and that Section 5 of the agreement required Supply to purchase from Columbia the quantities of natural gas at the points named therein, we reverse the Commission's order.

## ORDER

AND NOW, this 26th day of June, 1986, the order of the Pennsylvania Public Utility Commission in the above-captioned matter is reversed.

Judge COLINS dissents.